# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 07-03015-01-CR-S-FJG |
| ANGEL MONTANO, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. The government has responded.

Defendant asserts that evidence and statements seized as a result of a residential search should be suppressed. A hearing was held before the undersigned on December 11, 2007. Defendant was represented by counsel, Stuart P. Huffman, and the government was represented by Special Assistant United States Attorney T. Todd Meyers.

The government called Springfield Police Officer Eric Pinegar as its first witness. On March 20, 2006, he was on-duty and looking for defendant, who was a parole absconder. He received information regarding where defendant might be residing, and went to that location, after verifying that there were warrants for his arrest. Initial information was that defendant was possibly armed. He got this information from an anonymous source, which happened to be a probation and parole officer. Officer Pinegar went to 1503 North Delaware with several other officers. They were in

1

unmarked police vehicles and were wearing tactical vests. There were several officers in the back yard, and several on each side of the house. Officer Pinegar and Officer Deeds knocked on the front door, and defendant opened it. When the door opened up, defendant was standing behind the door, with a portion of the left side of his body shielded by the door. The officer was unable to see where his left arm would have been. They advised defendant who they were and why they were there. They stepped inside, took him into physical custody, and placed him in handcuffs. Defendant stated that he knew they were looking for him because he'd taken off his electronic monitoring. He gave them his name. A pat down search did not reveal any weapons on defendant. They were in a small room that looked like a family room with two sofas and a fireplace. A female and child were also in the room. Defendant stated that before they arrived, he'd been sitting on the sofa, eating, and when he said this he motioned with his head to the sofa against the west wall. This statement was made in terms of explaining that he wasn't doing anything wrong. It was not in response to a question. Officer Deeds asked for consent to search from defendant, who gave verbal consent. Officer Pinegar observed Deeds search the front room, and saw him locate a .22-caliber pistol between the seat cushions where defendant had stated he'd been sitting. It was about 5-8 feet from the front door. When the gun was found, defendant initially stated it wasn't his. The perimeter officers from outside came in. Officer DeWitt came from a back room carrying a digital scale and what appeared to be marijuana, which defendant said was his. Officer Pinegar stated that he contacted the probation officer, who faxed back the arrest warrant. Once that was accomplished, he told defendant that he was under arrest. Officer Pinegar talked to defendant in the kitchen, after advising him of his <u>Miranda</u> warnings, which he recited from memory. He asked him if he understood his rights, and defendant stated that he did. He did not ask for an attorney. The officer

made no threats or promises. Defendant agreed to talk to him. He said that he had purchased the pistol a few days before, off the street, from someone named "Shorty" or "Little Shorty" or "Little John" for $50.00. He said he didn't initially want a gun, but got it because he thought it was a good idea for protection for him and his family. Regarding the marijuana, he said it was his, he had it for personal use, but he did not distribute marijuana. The officer discussed with defendant a tattoo he had on the top of each hand, from when he was a gang member in Chicago. After defendant was placed under formal arrest, the officer performed a search of his person and located eight rounds of ammunition for a .22 -caliber pistol in his back pocket.

On cross examination, the officer testified that his tip from the probation officer who wished to remain anonymous was that defendant might possibly be armed. The information actually came from Officer Deeds, who conveyed it to Officer Pinegar. Officer Pinegar checked defendant through MULES. He did not check the utilities of the house, so he really didn't know who the homeowner was. He assumed that he was a resident because defendant had a relationship with Christy Madison, and they had a child together, who was present in the home. He could not recall if Ms. Madison said defendant lived there.

Regarding the arrival at the residence, when defendant opened the door, he had a dinner plate in his right hand. Defendant did not have a shirt on. When Officer Pinegar patted him down, the initial frisk did not reveal any weapons, and he doesn't recall if he felt any bullets. Defendant was immediately detained in handcuffs. At that point, the officer did not think that defendant could have reached out and touched the couch. He noted, however, that when they initially contacted defendant, he wouldn't move, wouldn't show them his hands, and wouldn't comply with their orders. Therefore, because he wasn't cooperating and because the officers did not know what was behind

3

the door, they handcuffed him. At the point when defendant was arrested, the purpose of the arrest was complete, and the officer admitted that they had no search warrant. Defendant never attempted to go back toward the living room or towards the couch. As far as giving consent, he does not believe they asked Ms. Madison about consent to search the house and he did not recall that she ever gave consent. He agreed that he did not use a consent to search form for defendant to sign. He assumed he was a resident due to the relationship with Ms. Madison. He did not look for mail or articles of clothing that would suggest that defendant lived there, but the officer noted that when they found the marijuana and the scale, defendant referred to that location as "his bedroom." [Tr. 22]. The officer agreed that when they started the search, Officer Deeds went straight to the couch and picked up the seat cushion. Officer Pinegar stated that they had the tip that defendant might be armed, and he felt that Officer Deeds was acting from experience in searching the couch.

On redirect examination, the officer stated that although he didn't mention in his report that defendant said he was sitting on the couch, eating dinner, there is another part of his report where he mentions this. The officer noted that defendant told him that he'd just been eating dinner while sitting on the couch, across from the one that Ms. Madison was sitting on. The next statement was that he knew the police would be coming for him because he had cut his electronic monitoring off and had violated parole. Defendant did not give any indication that the police would not be coming to that address to look for him, according to Officer Pinegar. He believed that defendant appeared to live there because he didn't have a shirt on, he was eating dinner, and he looked like he was very familiar with the residence. Also, defendant never stated he didn't live there. He claimed ownership of items found there, and referred to the bedroom as being his.

The next witness for the government was Officer Mark Deeds. He was working on the date

4

in question. He received a call from a probation and parole officer indicating that defendant might possibly be at a particular address in Springfield. He was also told he might have weapons. The officer went to the North Delaware address with several other officers. He knocked on the front door, with Officer Pinegar. Defendant answered the door, and the officer recognized him from photographs. Officer Deeds reiterated Officer Pinegar's testimony regarding where defendant was standing. He asked him to step out from behind that door, and he did not immediately do so. Therefore, defendant was taken into custody and placed in handcuffs. He saw defendant's girlfriend, who was sitting on a sofa to his left. As he was being taken into custody, Officer Deeds heard defendant say the same things about which Officer Pinegar testified. He stated he was sitting there eating dinner, and he motioned with a head gesture to a sofa on the west wall. He thought the sofa was 6-7 feet from the door. Defendant had on pants, but no shirt. Officer Deeds asked defendant for consent to search the residence because he lived there, and he believed he might have a gun or be involved in narcotics. He based his opinion that defendant lived at the residence on the information from the probation officer that this was an address of residence, which defendant had apparently used in the past. Additionally, he was there, eating dinner, and "[b]y all appearances, he lived there." [Tr. 31]. Officer Deeds asked him he had anything illegal in the house, like drugs or guns, and defendant said that he didn't. He asked him if he would allow them to search for illegal items, and defendant stated that he had nothing to hide, so he allowed them to search. The officer went to the sofa where defendant indicated he'd been seated when they knocked on the door, and began his search. He lifted the sofa cushion, and found a loaded pistol there. Defendant immediately said that the weapon was not his. When the marijuana was found, defendant claimed it as his. Officer Deeds observed Officer Pinegar provide defendant with his Miranda warnings.

5

Defendant appeared to understand and agree. He never asked for an attorney. No threats or promises were made. He said he paid $50.00 for the gun, and called the seller by several different names. The statement he made about the marijuana being his was an unsolicited one. They asked him about the significance of the tattoos, and he said he'd been a former gang member.

On cross examination, Officer Deeds stated that he got the information from the probation officer that defendant might be at that address, identifying the address as one where he'd previously resided. Officer Deeds made no current verification that defendant lived there. He stated that the search at the residence was within approximately one hour of when he received the telephone call from the probation officer. Officer Deeds testified that after a few seconds, defendant did comply by showing his hands and offered no resistance. He agreed that defendant did not make any attempt to go towards the couch. He did not interview Ms. Madison and he not ask her for consent to search. The officer stated that there were never any statements made to defendant or Ms. Madison that she might be arrested or the baby might be taken from her if defendant didn't cooperate.

Defendant called Christy Madison to testify on his behalf. She testified that defendant is her husband. On the date in question, she lived on North Delaware with her infant son. They were not married at the time. During March of 2006, defendant did not live with her. He had lived with her until October of 2005, and then "he went on the run. And then me and him separated. We didn't no longer live together." [Tr. 43]. They'd been separated from the time he went on the run until the day they found him there. When he came to the house that day, he was not living there at the time. She rented the house. Defendant was not listed as a resident, and did not get mail there. On the day in question, she had been sitting eating dinner with defendant. They were sitting on the same sofa. She thought it was her landlord when they heard the knock at the door. She had the baby, so she

6

asked defendant to answer the door. Defendant had been there a few hours, to see the baby, whom he had not seen before. He was also there to visit with her. The officers didn't really talk to her. They asked for consent to search, but she froze and didn't say anything. Defendant did not give consent, that she knew of. She was sitting about 6-7 feet from the officers and defendant, but she couldn't hear what they were talking about. When they were interviewing defendant in the kitchen, the officers told her to "sit down and shut up and don't move." [Tr. 46]. She stayed on the couch, and didn't say anything because she was too scared because there were so many officers. None of the officers made any statement to her about arresting her.

On cross examination, Ms. Madison stated that the baby was born on January 2, 2006, and the first time that defendant saw him was on March 20, 2006. This is the day he was arrested. She knew he was on the run, which is why she didn't have anything to do with him. How he came to be at her house was that he came to see the baby and came to check on her. She thought he had taken care of everything, and wasn't on the run anymore. The officers asked her for consent, and she did not say anything. She reiterated that she couldn't hear anything either. She doesn't recall that the officers ever said anything about arresting her.

It is defendant's position that because there was not a search warrant in this case and even considering this a search incident to an arrest, it was an unreasonably intrusive invalid search. He contends that a search incident to arrest does not justify a full-blown search of the arrestee's entire home. It is his position that the arrest was concluded and no weapons were found. He also asserts that there was no showing that the anonymous caller was reliable. Therefore, defendant maintains that there was not probable cause or reasonable suspicion to search the home absent exigent circumstances, of which none were shown. Additionally, defendant argues that neither he nor

7

Christy Madison gave consent to search the house.

The government maintains that defendant gave voluntary consent to search the residence. Even if the Court were to find that consent was not given, the government contends that the search of defendant and the immediate area within his control at the time of his arrest is an area that can be searched without a search warrant, and that the searches of the couch and defendant's pockets were proper searches incident to his arrest.

Having fully reviewed the testimony adduced at the hearing and applicable case law, the Court finds that it must be recommended that defendant's motion to suppress be denied.

At the outset, defendant raised the issue at the hearing regarding whether he actually lived at the North Delaware address at the time in question. The Court finds that the credible testimony introduced at the hearing establishes that there was ample evidence for the officers to reasonably believe that defendant was residing at the North Delaware residence with Ms. Madison on the day of his arrest. Further, the officers were aware that defendant had violated his parole, and that there was an outstanding arrest warrant for him. The law is clear that a valid arrest warrant carries with it the authority to enter a dwelling in which a suspect lives if there is reason to believe that the person named in the warrant is then inside the dwelling. Payton v. New York, 445 U.S. 573, 603 (1980). Here, the officers were aware of the existence of the parole violator's warrant and had ample reason to believe that defendant was a resident at 1603 North Delaware, and was at the house at the time they arrived. They had received the information regarding his violator status and his location from a probation officer, the latter based on an address of residence, which defendant had apparently used in the past. This information was received within an hour of their arrival at the residence. Their entry into the house to arrest the defendant was therefore lawful. United States v. Risse, 83

8

F.3d 212, 216-17 (8th Cir.1996).

Turning next to the issue of consent, Officer Pinegar testified that defendant gave verbal consent when Officer Deeds requested consent to search from him. According to the testimony of Officer Deeds, he asked defendant if he would allow them to search for illegal items, and defendant stated that he had nothing to hide, so he allowed them to search. Ms. Madison testified that the officers asked for consent to search, that she froze and didn't say anything. Regarding whether defendant gave consent, she said, "[n]ot that I know of, no." [Tr. 45]. She then acknowledged that she was six or seven feet away from where the officers and defendant were standing, and that she was not able to hear the conversation or what they were talking about. Therefore, based on the credible testimony from both officers, who did hear and participate in the conversation, defendant allowed them to conduct the search. There was clearly no testimony that defendant ever tried to stop the search, or demonstrated in anyway that he did not want them to conduct the search.

Even if the search had not been consensual, it is clear that, under the circumstances of this case, the search was also a proper search incident to the arrest. It is well-established that when a person is arrested, law enforcement officers are entitled to conduct a search incident to the arrest. In cases where the arrest occurs in a home, or at a hotel/motel room, the search is limited to the arrestee's person and those areas within the immediate control of the arrestee. Chimel v. California, 395 U.S. 752 (1969); United States v. Miller, 946 F.2d 1344, 1345 (8th Cir.1991). The area within the "immediate control" of the arrestee has been broadly defined by the Eighth Circuit, and "is not constrained because the arrestee is unlikely at the time of the arrest to actually reach into that area." United States v. Palumbo, 735 F.2d 1095, 1097 (8th Cir. 1984). The facts of a specific case are significant in determining whether a search was lawful as

Case 6:07-cr-03015-DW   Document 40   Filed 01/09/08   Page 9 of 11

incident to a valid arrest, including whether the arrestee was handcuffed or detained at the time of the search. Id. at 1097. Other factors to be considered include the distance of the items or places searched from the arrestee, Miller, 946 F.2d at 1346, and when the search occurred, relative to the arrest. United States v. Hill, 730 F.2d 1163, 1167 (8th Cir. 1984). In determining whether a search incident to an arrest is valid, the Court must evaluate the totality of the circumstances. United States v. Lucas, 898 F.2d 606, 609 (8th Cir.1990).

The officers testified that defendant was not initially cooperative when they went to the residence. Further, the credible testimony from the officers was that he admitted he knew law enforcement officers would be looking for him because he had violated his parole by removing his electronic monitoring. Additionally, the probation officer had advised them that defendant might be armed. Defendant indicated that he had been seated on a sofa just several feet from where he was standing when the officers came to the door. The testimony from the officers was that it was between five and eight feet from where defendant was located. Defendant was promptly placed in handcuffs based in part on the information that he might be armed and his initial lack of cooperation. The Court recognizes that his being handcuffed is one factor to be considered in determining whether the search occurred in an area within his immediate control. The officers testified additionally, the defendant did not attempt to make a move toward the sofa. Other factors to consider, however, include the fact that there were other occupants close by in the area, including an infant; the fact that the search was immediate; and it was limited to the area where defendant indicated he had just been sitting. The Court finds that it was reasonable under the totality of the circumstances to conduct a search of the immediate area where defendant had been sitting, which was within close proximity to where defendant was standing

by the door, as well as close to Ms. Madison and a baby. For their own safety and that of the residents, the officers were within their legal rights by searching the couch where defendant had been sitting mere moments before, and the Court finds that this was a valid search incident to the arrest. Once a loaded weapon was discovered and defendant was formally arrested, the pat down search was clearly within legal parameters. Accordingly, it must be recommended that defendant's Motion to Suppress be denied.

For the foregoing reasons, it will be

RECOMMENDED that defendant's Motion to Suppress be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
UNITED STATES MAGISTRATE JUDGE

DATE: 01/09/07

11

Case 6:07-cr-03015-DW   Document 40   Filed 01/09/08   Page 11 of 11